Your Honor. May it please the court. Your Honors. Your Honor. Counsel. Good morning. Good morning. I'm Lorraine Maury and I represent Appellant Bonnie Huizenga. Ms. Huizenga is viewing this hearing from her home in Prescott this morning. I would like to reserve two minutes of time for rebuttal if that's all right with the court. Thank you. And I will keep track of my own time. Thank you. This court should reverse the district courts grant a Dominik Spang and instead grant it to Appellant Ms. Huizenga for two main reasons. Under public policy and substantive law. If the court doesn't mind, I'd like to use Dirk Spang who is the decedent and Dominik Spang who is the appellee by their first names in order to avoid confusion. We are appealing the district courts finding that a written power of attorney was not required for the change of beneficiaries on life insurance and retirement benefits from Dirk Spang that Dirk had already made based on the fact, according to the district court, forgive me, that because Dirk had already made the decision to change the beneficiaries, the fact that these beneficiary changes were made at a time when he was severely incapacitated, permanently incapacitated, the person that made the changes knew of his... Counsel, how do you get around the district court's evidentiary ruling that the opinion of Dr., is it Conroy? Monroy. Monroy basically was not admissible for lack of proper foundation. The way we get around that, your honor, is that Dr. Monroy was the attending physician when Dirk was actually admitted to the hospital. She's also the medical but also had reviewed his medical records before, during, and after his death and after his death at the request of the insurance company and Walmart. But the only part of what you just said is in the affidavit that was presented to the court, there was no discussion with regard to review of the files and all that stuff. It just said she was the attending and the head. In essence, it seems to me we have to find that the district court abused its discretion under the rules of evidence in not admitting that exhibit, don't we? In order to afford relief to your client. Because otherwise you have no evidence as to his competency at the time the change was made. Your honor, respectfully, that there is evidence in the record that was submitted with the notes but also showed the notes of the actual medical records. But they're not self-authenticating, counsel. You got to have a witness to testify about them. And if the district court rules that your witness is not competent, then you have no evidence. I believe the district court ruled that her statements were conclusory. However, because she was the attending physician, I don't believe under the rules of evidence that she would have to submit an actual report that she reviewed all of the actual medical records. The only thing that was before the court was her affidavit, correct? Yes, that was her affidavit. But I believe there was also the correspondence between her and the insurance company, prudential insurance company as well. Counsel, you and I may have a different view of the rules of evidence. But my understanding on summary judgment is that if the court determines that evidence is not admissible under the rules of evidence, then it can't be offered to support a summary judgment decision. I see your point, Your Honor. However, we believe that the medical records that were provided with the summary judgment documents were sufficient to support Dr. Monroy's conclusions. Mr. Spang, did they contest or present any evidence before the district court that Derek was actually competent or any evidence to refute the affidavit from Dr. Monroy that he was not competent? No, they did not do anything to refute that evidence. All right. And I did not see any argument before us that he was competent. In fact, all of the argument was that he was competent at a different time that, as it turns out, legally is irrelevant. So I don't know how, I guess the issue from my perspective is how the district court entered summary judgment on that basis when those facts were, you as a movement came forward with facts that he was incompetent at the appropriate time, and it was uncontested. Is there anything in the record before the trial court that could contest that fact? I'm sorry, that could contest the fact? Contest the evidence that was submitted, the fact that he was incompetent at the time his friend made the change. No, there was no evidence of that. That was submitted by Dominic Spang. Dominic, the court had, our contention is, is that the power of attorney, a written power of attorney would have been required in this case in order for these beneficiary changes to become effective. The court had directed us to, this court had directed us to discuss the Geller case and to of the restatement sections. And in the Geller case, our case is distinguishable from the Geller case. Briefly, in the Geller case, we had someone who was an acute alcoholic and had episodes of the acute alcoholism, had suffered a stroke. There may have been times that he would have been deemed temporarily incompetent. He signed a written power of attorney in favor of his sister in 1964 to act on her, act on his behalf. And she did act on his behalf for two transactions after that. After he died, Mr. Geller's daughter challenged the written power of attorney and also those transactions. The court in that case found that there was, first of all, that there was a written power of attorney, such as there is not here. But the actual court discussed the actual mental incompetence, whether he may have been temporarily incompetent at the time that some of these transactions would have been made, but they therefore concluded that the transactions were valid. He did have a written power of attorney that was in place. Our case is distinguishable here because here there is no written power of attorney or any other writing that would have given Ms. Liska, who actually made the changes, the power to make those changes. He was deemed permanently incapacitated at the time of the beneficiary changes and Ms. Liska knew it. The relevant language from the Geller case is, quote, as a general rule of common law, the power of an agent does not survive the incompetency of the principal. And that is not the legal principle that the district court applied. So from my view, that's what makes the Geller case relevant. So the issue is, was he competent at the time as friend indisputably made the change? He didn't make the change. And as you've said, and I, from the review of the record, Mr. Spang did not provide any evidence to counter that fact in summary judgment. That is correct, your honor. So as I understand it, your position is you're not contesting that there's multiple examples of a directive given by Dirk to Ms. Liska to make the change. In your view, the case turns on whether or not he was competent at the time she actually made the change that he had directed. Your honor, we do not concede that he actually made those directives to Ms. Liska. We only have her unsworn. What evidence do you have to counter her sworn testimony as to the multiple directives that he gave her on different occasions to make the change? We don't have any direct evidence of that, your honor. However, the statements of her are unsworn hearsay statements. She just provided letters, right? She didn't swear to any of this. Yes, that is correct. And there was no testimony taken at a hearing. Is that correct? That is correct. And under Arizona law, the declarations of an agent are insufficient to establish agency. And that's under Jolly B Count 151, Arizona 506. So the, so her declarations in and of themselves are not, are not reliable as they are hearsay statements. It's an unsworn. It's not in any kind of affidavit. I am down to one minute, your honors. I'd like to reserve that for rebuttal if that's all right. Yeah, we'll do that. I'll give you two minutes. I appreciate that. Thank you. Judge Tallman, can you hear me? I can hear you just fine, Mr., is it Amenetti? Mr. Amenetti, yep. Very good. May it please the court. I'm Justin Amenetti, and I'm joined by my co-counsel, Pete McGinley, and we represent the appellee, Mr. Dominic Spang, in this matter. Your honors, this case hinges on the application of black letter agency law. And to explain why, I want to start off with addressing a question Judge Tallman asked, which is the evidence of a direct, actual express agency relationship between Ms. Liska and Mr. Spang, Dirk. The summary judgment record is full of evidence showing that there was an express principle. Any of that sworn, were there any sworn declarations or this all just argument in, isn't it really a letter from Mr. Spang that was in the record? There's multiple letters, your honors. None of which are under oath. Correct, your honor. Okay. So you said this is a matter of black letter law, and I agree with you, as a general matter, that you don't need a written document to show agency under Arizona law. But it's also a black letter Arizona law, one, that we follow the restatement, and two, that if the principle is incapacitated, the agency ends, unless there's a durable power of attorney, which is why we have that provision in our law. So how does that, how do you contend that agency continued to the point after he was incapacitated, when there was no evidence submitted in the district court to refute the movement's evidence that Mr. Dirk Spang was incapacitated at the time his friend made this change? Two responses, your honor. First, the dispute that he was incapacitated at the time. Based on what evidence? Based on the letters that Ms. Liska and Ms. Johnson submitted. So evidence that Judge Tallman wouldn't accept, because it wasn't sworn, it's hearsay. Sure, your honor. And no argument before the district court or this court that he was competent at the time his friend made the change. Can you point me to anything in the record that that occurred in the district court, or in your briefing that occurred here? I would turn to the letters. I mean, that's the record before us. I should note that- And counsel, I want to note, thank you for doing this. I know you were appointed counsel, you weren't counseled below. So I apologize if this appears harsh. I actually very much appreciate the representation and the work that you're doing here. Thank you, your honor. I should note that we did not move for summary judgment in this case. The other side did. And they had the burden to show, under Arizona law, a rebuttable presumption that Mr. Spang- Sure, but once a movement files a motion for summary judgment, the opposing party can't rest on their pleadings or their allegations, have to come back with some evidence. And I understand Mr. Spang was pro se, but he didn't do that. I would just turn to the letters before the court submitted to Judge Tucci below. The second response would be restatement 3.081. 3.081 says, if a principal is incompetent at any time, the agent must have notice of the permanent incompetency or the inability of the principal to  So he's terminally ill, has a history of short term memory loss. He's now been in a very serious car accident. And she makes this change 15 hours before his death in hospice care where he's heavily medicated. And she did this after, apparently after he lapsed into lack of consciousness. But is there any evidence or did Mr. Spang come forward with any evidence to suggest that his friend, and I'm sorry, I'm forgetting your name, Miss Liska, that she didn't know these facts, that she didn't know that there was an issue with whether he could do this himself or his competency? Yeah, I think we should turn to the facts and look at them as a whole in this instance. Because if we look at them, you get Dirk Spang's cancer diagnosis in early April 2018. He then reiterates to both Miss Johnson and Miss Liska over the course of two months that he wants to make this beneficiary designation change. But he doesn't do it, right? I mean, isn't that part of the problem? The law, I don't dispute that they could be his agents and the things that they did with his bank account and paying his health insurance, etc., that no one's going to charge them of conversion or doing something illegal because it appears they had agency. But he was competent then. And that's the significant point. If you have an agency relationship and it's not in writing, it's important that the agent be able to countermand anything that is not within the scope of what they delegated. But that's the reason why you can't do it when somebody's incapacitated without the durable power of attorney. If an agent was running amok and doing something that they weren't authorized to do, the principal would have no means of stopping that or correcting it. So, I mean, I guess, and I am sympathetic that you inherited this record, but the problem is that there's nothing to show, there's no, there's nothing to refute the fact that the agency ends when he's incapacitated and that they presented uncontested evidence that he was incapacitated at the time that Ms. Liska made this change. Your Honor, I respectfully disagree. I don't think they've submitted any admissible evidence to show that. They have an affidavit from the treating doctor and the medical director of the hospice center. Now, that you, I suppose, could argue that that might not be sufficient to carry the day, but it seems that it's, that it at a minimum creates a disputed issue or fact and that the district court could not enter summary judgment for Mr. Spang on that record. No, I just think if you look at the letter submitted to the court, it's very clear that from April 2nd all the way on, even to the point Dirk Spang passed away on June 7th, he kept reiterating his intention to have his designated beneficiary changed from his girlfriend of 10 years ago to his brother. And again, it's not admissible. It's not, it's not valid evidence. It's just a letter. So we, I mean, we come back to the same problem. This is what you have to rely on. And as you've just said, it's just the unsworn letter from a friend. We have the record that we have, Your Honor. He was pro se below. He's a German speaking native. It is. No, I appreciate that the bind that you are in, and I think you're doing an admirable job with the facts that you have. The problem is the record is what it is and the law is what it is. Yeah, but we should turn back to the law because there's a rebuttable presumption under Arizona law that Dirk Spang was competent all the way up until the time he passed away on June 7th. And you don't think they rebutted that with a sworn statement from the treating doctor that he was incompetent? Absolutely not. Then what does it take to rebut that? I mean, Arizona law makes it very clear. I'm sorry, go ahead. Arizona law makes it very clear that confusion or idleness or, you know, even moments of lack of lucidity. But that's not the evidence that we have. We have more than that. We don't just have some random person saying he seemed confused. We have his treating doctor and the medical director of the facility with 20 years experience treating patients in hospice care saying I don't think he had capacity to do this at the time it happened. So that would, I don't know what else you need to rebut a presumption. I mean, her sworn, the doctor's sworn affidavit is wholly conclusory. She provides nothing to support her observation that he was incapacitated at the time the change was made. And Ms. Felisca obviously had no notice that the doctor harbored this view at the time she made the change. So she was under the assumption that Dirk Spang was competent. Does Ms. Felisca say anything in her unsworn letter about what she knew about Mr. Spang's condition? I mean, they were at the hospice center. I understand they were there seeing him. Correct. Right. And they knew he was terminally ill. Correct. And does she say whether she was in the room and she, you know, she saw that it was 15 hours before death? No. What are, is there any evidence about those facts? Her letter just, it makes, she makes it clear that she thought he would get better, that he maintained mental capacity. I can quote from it. Dirk's memory was getting better. That's in 2ER71. But that does not refer to the history that he had in the medical records of short-term memory loss. He'd been having memory problems before he was in this unfortunate car accident. That's correct. He was, he was going in and out. But like I said, he's had this position that he wanted to change his designated beneficiary all the way from April 2nd throughout the course of his, up until June 7th. So even if we don't dispute that, and I'm very sympathetic to what you're proposing, and even if we accepted that as true, we still have all these other problems with the end of agency when he's incapacitated and the evidence in the record that he was incapacitated, the undisputed evidence that he was incapacitated. Well, then I would, like I said, I would turn to Arizona law and I would rely on the rebuttable presumption that he was competent. And then I would turn to 308.1, which says that she lacked notice that he was permanently incapacitated from a mental perspective. The, you guys asked us to look at comment D of 3.06 and it reiterates the point 308.1 makes as well. So if I was writing this opinion or honor, I would start with, there was a clearly a express actual principal agent relationship here. But why would we start that when that, that even if there was expressed agency, it ends when he's incapacitated. Because of the 3.8081 point. So, so there's no inference from this evidence that 15 hours before his death, after he's told, allegedly told his friend for a couple months, he wants to make this change, that she suddenly decides to make the change. It seems to me the clear inference from that evidence is she knew he was near death. He would, the end was near and she went to make the change with what she thought would be before it was too late. I mean, another point we should emphasize is she's a totally disinterested agent. She did not know Dominic Spain. She did not know as far as we know, that's the problem on this record in the way this was done on summary judgment. All we have is her say so in a letter. We know nothing about her. She may be totally disinterested. Um, but there's also letters where they were expressing animus towards his mother. So, I mean, we, we don't know what their interest was in this. We still have evidence of it. All I have is the record before us, your honor. And, um, I see my time is running out. I did have one may not be in the record and tell me if it's not, I'm just curious, what is this estate worth? Uh, it is in the record. The life insurance is worth approximately $240,000. And, uh, the retirement benefits is worth approximately 70,000. So it's about a $300,000 case at the end of the day. That's correct, your honor. Thank you. If there's no further questions, uh, I ask this court affirm judge Tucci's judgment below. Okay. He's a bit taller than I am. Judge, uh, Owens could tell you the story about the crank. Oh, no, no, no, I've got you. So at the Supreme Court of the United States, they, it's, well, maybe now it's automated, but back when I was a law clerk, it was a hand crank. And so literally you had to hand crank to move the podium up or down. And everyone was always very nervous to touch that crank. But one guy walked in there and actually did it and it worked. Was it noisy? It was noisy. It was distracting. So this is a lot smoother, but please go ahead. Thank you, your honors. Uh, to touch on, uh, what, uh, what Mr. Amenetti had, um, actually spoke about regarding the timeline. And I'll just touch on that briefly is that, um, according to these, according to these letters of Ms. Liska that she was asked multiple times, or he allegedly asked her multiple times that, or spoke about it, didn't actually say, please change these, spoke about changing, um, changing the beneficiaries. That was back in April, back, um, April 2nd, 2018. He got in a car accident on May 29th, supposedly asked her at that point. He entered hospice on June 3rd, supposedly asked her at that point. Um, and then the beneficiaries changed on June 6th. There's no evidence in the record that not other than her unsworn hearsay statement, but there's also no evidence in the record that Dirk even actually inquired as if to ask if it had actually been done. So that would lead, certainly lead a strong inference that he did not exactly really want that, or, or even know that he had, he asked it even before that. Counsel, what evidence is there in the record that Ms. Huizing, uh, had any contact with Dirk over the 10-year period after they terminated their relationship? There was, actually, their relationship was a friendship relationship. It was mischaracterized in the record as, as that it was, it was a girlfriend. Um, she was not, he was, she was his good friend. Uh, there was, I do know that there was in the record that there, that where she actually, Ms. Huizing actually visited him. And I don't recall if it was right before he went into hospice or right after, but there was evidence in the record. I believe it at that point. I apologize. I don't have the exact pin site for you. Okay. Thank you. She did go see him because she was, they were, they had been friends for many, many, many years. Okay. And if there's no other questions, your honor, um, your honors, excuse me. Um, I, you know, we, we do request that the, uh, summary judgment be reversed and granted in favor of Ms. Huizinga. Well, counsel, how could we grant summary judgment in favor of Ms. Huizinga if we conclude that we can't grant summary judgment to DERP because there just isn't sufficient admissible evidence in the record to support summary judgment? It seems to me that the best we can do for you is reverse and send it back for further discovery. I mean, frankly, my concern is the point Judge Owens touched on. By the time we get done with the attorney's fees in this case, it's going to have you all talk the possibility of mediation. I know, your honor, I don't believe that there was ever a talk of mediation or settlement in this. You might want to think about that because I think at the end of the day, there's nobody's going to win here except the attorneys. Well, except one of them, one of them's not getting paid. So I don't know. Right. And I don't think he signed on to be a trial counsel. So. So, no, I understand your point. And I am over time if I may respond. Of course. Okay. Thank you. Thank you. I appreciate it. To respond to you is that, you know, there are no genuine issues and material fact in our view that he was, that he had capacity, that Ms. Liska had the agency, and therefore, we believe that the beneficiary designations should therefore fail. I understand what you're saying about perhaps. Yeah, I don't think you should, my question about mediation in order to add additional argument here. I just want to know whether you might be interested or your client might be interested in pursuing mediation before you, before we issue a ruling in the case. I would certainly be happy to speak to my client about that. She's always been open-minded. I would believe that she'd be open-minded on this as well. Then I cannot speak with, for Dominic's name. Okay. And if I may then, I'm actually going to ask Ms. Ramonetti. I know you're, stepped up to represent this case pro bono. If this court were to seek or suggest mediation before our mediators in the Ninth Circuit, if you need to talk to your co-counsel, that's fine. Is that something you would stay on for or is your termination end as soon as the argument is done today? I think we'd probably stay on. I'm sorry, I can't hear counsel. Your Honor, I think we would probably stay on. I obviously would have to talk to the client. He does not speak English. He only speaks German. So we've been going through a translator. So it does take a bit more time. But of course, and we would give you the time to sort this out. I guess my question is, there's nothing in terms of your firm's position that prevent you from staying on to work with the mediators in the Ninth Circuit? As of right now, I do not believe there's anything that would prohibit me from continuing to represent Mr. Spang in this case. He's obviously asked to consent. Okay, very well. Thank you so much. Thank you both for your argument and briefing this case. It's a very interesting case and this matter is submitted. In the end, thanks again for stepping up and representing the client here. All right, we'll go ahead and call the next matter for argument.
judges: TALLMAN, OWENS, BADE